IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**EBONE D. COAKLEY**,

Plaintiff,

v.

**SERENITY PALLIATIVE AND HOSPICE CARE OF HILLENDALE, INC.**, et al.,

Defendants.

Civil Action No. 1:13-cv-3537
MHC-JSA

**REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## 1. INTRODUCTION

Plaintiff Ebone Coakley filed this action under Title VII and the Family Medical Leave Act for allegedly terminating her employment due to her pregnancy and her stated intent to take FMLA leave as a result of her pregnancy.[1] Defendants moved for summary judgment on all of Plaintiff's claims, showing that there were legitimate, non-discriminatory reasons for Coakley's termination: First and foremost, on the day of her termination Plaintiff was argumentative and disrespectful towards her supervisor, and she refused and failed to report to the office as instructed. This behavior is compounded by the fact that for over four months Plaintiff had failed to meet her patient admission quotas, even after being

---

[1] Dkt. 1

explicitly warned that her job was on the line. Additionally, Defendants demonstrated that that Defendants Serenity Palliative and Hospice Care of Savannah, Inc., Serenity Palliative and Hospice Care of Valdosta, Inc., and Providence Hospice, Inc. (hereinafter "Defendants SVP") have no connection to Coakley and cannot be considered her employer under either Title VII or the FMLA.

In her Response,[2] Plaintiff argues that Defendants' proffered reason for Plaintiff's termination is pretextual based on purported factual inconsistencies related to the reason for her termination and on the purported existence of two comparators who were not pregnant and were not terminated. Additionally, Plaintiff argues that all Defendants are proper parties to this action because they operated as an integrated enterprise and constituted a single employer.

Plaintiff's arguments hold no water. There has not been anything even approaching a factual inconsistency in Defendants' position since Plaintiff was terminated. Defendants have been crystal clear in their stated reason for terminated Plaintiff on May 27, 2011: she was openly insubordinate and disrespectful to her supervisor and she failed to report to the office as instructed. Moreover, neither of the individuals identified by Plaintiff are proper comparators because (1) their behavior was not the same as Plaintiff's, (2) there is no record evidence that they were not pregnant, and (3) one of them did not hold the same position as Plaintiff. Finally, Plaintiff's argument that Defendants SVP are properly joined to this action because they formed an "integrated enterprise" with the remaining Defendants is a misunderstanding of the applicable authority. Defendants SVP have never been

---

[2] Dkt. 83.

anything other than separate, independently operating companies managed by the same company as several other Defendant hospices, but having absolutely no connection to Plaintiff, the operation of Plaintiff's direct employers, or the employment decisions at issue in this case.

2.  ARGUMENT AND CITATIONS TO AUTHORITY

1.  **There is No Evidence Suggesting that Defendants' Proffered Reason for Plaintiff's Termination is Pretextual.**

While Plaintiff tacitly acknowledges that her employer had a completely legitimate reason to terminate her, she nonetheless claims that the proffered reason is mere pretext. In support of this argument, Plaintiff attempts to show that Defendants have offered changing and contradictory reasons for her termination, and that other similarly situated employees were treated more favorably than her. In reality, the primary reason for Plaintiff's termination has never changed, but Defendants have at times highlighted *all the other ways in which Plaintiff was an extremely poor employee*. And the purported comparators Plaintiff has identified are anything but; one did not hold Plaintiff's position, and neither was ever openly insubordinate in the manner that Plaintiff was on the day of her termination.

a.  **Defendants' reasons for terminating Coakley have not changed.**

When Plaintiff was fired, Messick could have chosen any number of reasons to terminate her. Her performance had not improved in the month since the April 27 meeting over the Plan of Correction; Plaintiff had barely any admissions for May and could not possibly meet her quota for the month, now for the fifth month in a

row.[3] As Weathington would later explain to the GDOL, Plaintiff's timesheets also showed that she was not working 8-hour days and she had not filled out her marketing reports correctly since receiving a reprimand the month before.[4]

There has never been any question that Plaintiff's gross insubordination on May 27, 2011 was the primary basis of her termination. There is no question that Weathington ordered Plaintiff to return to the office **immediately**.[5]  Defendants acknowledge that Coakley now swears that "Weathington did not use the word "immediately." [6]  However—in an actual example of changed testimony—Coakley stated in her Interrogatory responses: "I stopped and told Sandie to handle the situation as she would and that I was used to having my patients and being unqualified or pushed out until the next month.  . . . She became upset and instructed me to come to the office **immediately** and hung up the phone." [7]Instead, Coakley went to obtain a signature for a patient referral,[8] then went to see her counselor without informing Weathington of the appointment,[9] then made a second attempt to obtain the signature before the afternoon conference call at 3:45PM.[10] There is no question that Plaintiff—at a bare minimum—stated to multiple

---

[3] Dkt. 85-1 at 56.

[4] Dkt. 85-1 at 56.

[5] Def's SOF at ¶ 102.

[6] Def.'s SOF, at 103-104, and 105.

[7] (Plaintiff's Responses to Defendant's First Continuing Interrogatories, pp. 13-14, Coakley Dep. Exhibit 18).

[8] Def's SOF, at ¶ 103. Denying the term "immediately" in direction contradiction to her Interrogatory Responses.

[9] Def's SOF, at ¶ 104-105. Again, denying "immediately" without explanation.

[10] Def's SOF at 106. Again, denying immediately.

employees during that conference call that she was not sure if she would comply with Weathington's order.[11] There is no question that Weathington then warned Plaintiff that her "refusal to come to the office is grounds for immediate termination."[12] And there is no question that Plaintiff did not finally arrive to the office until 5:25PM, after everyone else had left for the holiday weekend, and after the decision to terminate her had been made.[13]

Lethal to Coakley's allegations that Defendants have changed their story are the responses given only days after her termination. On the Separation Notice, when asked, "[I]f for other than lack of work, state fully and clearly the circumstances of the separation," Weathington responded, "insubordination and failure to perform job duties as described in her offer letter and job description. Failure to complete account profiles per process and policy. Failure to complete marketing report per policy and [illegible]."[14] Per the actual question, this is a broad statement of the "circumstances of the separation."

But while Plaintiff *could have been terminated* for various reasons, the straw that actually broke the camel's back occurred on May 27, 2011. When asked "What was the reason this person was discharged ***on this particular day***?" Weathington responds "[I]nsubordination. Failure to follow a direct directive to

---

[11] Def's SOF at ¶ 108–111. A choice of words Coakley later testified was "poor." (Coakley Dep., p. 201:5-7).

[12] Def's SOF at ¶ 114.

[13] Def's SOF at ¶. 119.

[14] Dkt. 85-1 at p. p. 54 (Plaintiff's Exhibit 30)

come to office immediately to speak [with] Senior VP of Operations and Administrator. Verbalizing to Administrator that Administrator was liar."[15] b

### b. Identification of the decision maker has not changed.

Plaintiff also argues that Defendants have changed their story about who terminated Plaintiff. That is plainly untrue. Both Defendants' 30(b)(6) designee, and Messick himself have stated unwaveringly that Messick authorized the termination of Coakley[16]

Plaintiff argues without any factual support that "documents submitted to the DOL by Defendants reveal that the termination was decided and carried out by Weathington."[17] Plaintiff cites no record facts for this allegation because none exist. Weathington filled out all the paperwork provided to the GDOL and she identified herself as the person "[w]ho told this employee that he/she was discharged."[18] Absolutely *nothing* in the record contradicts Defendants' claim that Messick authorized Weathington to terminate Coakley. The trier of fact cannot reasonably infer the contrary in the absence of any evidence whatsoever because Weathington delivered the news.

The fact that Messick made the decision to terminate Coakley is fatal to Plaintiff's discrimination claims. There is no indication that Messick was even aware of Plaintiff pregnancy, and thus Plaintiff cannot establish the requisite nexus

---

[15] Dkt. 85-1 at p. 56. (Plaintiff's Exhibit 31) (emphasis added) Again, this statement was given mere days after the termination.

[16] Messick authorized Weathington to terminate Coakley because of her insubordination and her failure to return to the office as instructed. (Messick Decl. [Dkt. 79-5] ¶10)

[17] Dkt. 83, p.10.

[18] Dkt. 85-1 at p. 56, Exhibit 31 (question 3)

between her pregnancy and her termination.[19] There is no record evidence to support any other conclusion. Indeed, there is no evidence on the record that Messick knew anything about the supposed comparators Ferguson or Scott. The evidence does show, however, that Messick was aware of Plaintiff's substandard job performance, her lack of improvement, and her open insubordination on the day he authorized her termination.

### c. Plaintiff has failed to identify any material comparators.

"In determining whether employees are similarly situated, we have explained that *a 'comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer*.' "[20] "To make this showing, the plaintiff and her comparators must have engaged in the same or nearly identical misconduct."[21] "[D]eficient job performance remains a non-discriminatory basis on which employers may make employment decisions, so long as performance standards are applied equally."[22]

Putting aside the fact that the ultimate decision-maker in this case appears not to have even known of Plaintiff's pregnancy, Plaintiff has also failed to identify any comparator that might permit a factfinder to infer discriminatory intent. Plaintiff attempts to make comparators out of Christiane Ferguson and Crystal Scott, but

---

[19] *Cline v. Catholic Diocese,* 206 F.3d 651, 658 (6th Cir. 2000).

[20] *Id.* (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)) (emphasis added).

[21] *Hubbard v. Meritage Homes of Fla., Inc.*, 520 Fed. App'x 859, 863 (11th Cir. 2013) (citing *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 & n.2 (11th Cir. 2006)); *see also Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999)).

[22] *Torres-Skair v. Medco Health Solutions, Inc*., 595 Fed. Appx. 847, 854 (11th Cir. 2014).

neither is a "nearly identical" non-pregnant employee with "nearly identical" misconduct.

Christiane Ferguson was not an ideal employee. Her personnel file contains multiple disciplinary entries. From September 2011 through May 2012, she was disciplined for failing to follow various instructions or company protocols.[23] At some point her file reports that she falsified information about her scheduled appointments and her location.[24] And on May 16, 2012, two weeks before she resigned without notice, Ferguson failed to report to the office as instructed.[25] The details of this incident are not clear from the record, but a Plan of Correction issued at the time suggests that the instruction was left by voicemail or text and that Ferguson did not comply.[26] It is unclear whether Ferguson acknowledged receiving the instruction and ignoring it, or whether she claimed not to have received it at all.[27] When Ferguson resigned without notice on a conference call, she acknowledged that her record at Serenity was not good, and stated that a resignation without notice would thus not harm her record.

Ferguson is not a proper comparator for two reasons: (1) her relevant misconduct occurred a year after Plaintiff's termination, and after Plaintiff had already initiated an EEOC investigation over her termination; and (2) her misconduct is not identical to Plaintiff's. Plaintiff was openly defiant to her supervisor both on the morning call when she was order to report immediately and

---

[23] Dkt. 85-2 at 3–15.

[24] Dkt. 85-2 at 13.

[25] Dkt. 85-2 at 7–10.

[26] Dkt. 85-2 at 7.

[27] Dkt. 85-2 at 7–10.

on the afternoon conference call in the telephonic presence of multiple staff members. And even after being warned that her refusal to return was grounds for termination, Plaintiff *still* failed to return to the office for hours.

Ferguson's "insubordination" does not appear to be anything of the same magnitude as Plaintiff's behavior.  At no time during her employment did Ms. Ferguson display oppositional, argumentative or disrespectful conduct to Weathington as did Coakley.  (Weathington Second Declaration, ¶3).  Ferguson never argued with Weathington, never accused Weathington of lying to her or sabotaging her efforts as did Coakley.  (Weathington Second Declaration, ¶4). Ferguson never made an insolent comment on an afternoon conference call, as did Coakley. (Id)

Plaintiff's second purported comparator, Crystal Scott, held a Social Worker position.  She was not a marketer like Plaintiff. Her misconduct occurred approximately 9 months after Plaintiff's termination (and after Plaintiff filed her EEOC complaint over the termination). On February 29, 2012, Weathington issued a verbal warning to Scott over "insubordination."[28] After Weathington told Scott on a conference call that her comments had been inappropriate, Scott retorted that she found Weathington's comments inappropriate. Weathington then ordered Scott to come to the office immediately and Scott replied that she could not because she had to pick up her son. Weathington then told Scott to make other arrangements for her son and that she would wait for Scott to arrive. There is no evidence of whether or not Scott actually came to the office as instructed. Weathington did, however, tell Scott that she would be terminated immediately for further insubordination.

---

[28] Dkt. 85-2 at 20.

There is no evidence as to any of Scott's other job deficiencies, although whatever they might have been, they were assuredly different than those of Plaintiff, who held an entirely different job position.

Scott's "insubordination" appears quite different in character than Plaintiff's. There is no indication that Scott *refused* to return to the office as did Plaintiff; instead, she stated that she could not return due to her obligation to pick up her son. And there is no indication that Scott actually failed to report back to work after Weathington instructed her to make alternate arrangements. Of course, this is all beside the point, because Scott was not a marketer as was Plaintiff, and Scott did not have five months of failure to meet her quotas behind her at the time of her "insubordination."

Plaintiff seeks to hang her hat on the word "insubordination" and create comparators out of it. The misconduct of Ferguson and Scott appear to be nothing more than failure to follow instructions rather than blatant defiance in front of multiple other employees. It is clear that Plaintiff knew she had been ordered to return to the office immediately and chose to ignore that order. This is not the case for either Scott or Ferguson. Beyond these differences, Coakley was given the chance to speak with Messick if she believed that Weathington had lied or was being unfair. Coakley refused to do so. [29] Neither of these other employees— admittedly, neither a model employee—can meet the strict "nearly identical" standard required of comparators in this Circuit. As such, Plaintiff cannot establish a nexus between her pregnancy status and her termination and her claims must fail as a matter of law.

---

[29] PSOMF, ¶ 124–127. Coakley did not contest these statements factually, she only claimed they were not material. (Dkt. 86).

**d.** **Defendants SVP are mere Bystanders, Not Plaintiff's "Employers" and are Improperly Joined as Defendants**

Coakley has not materially contested the following undisputed facts:

- Defendants were organized as separate corporations [Dkt. 1];
- While the Hillendale/ Northeast hospice operated out of Conyers and then Snellville, Providence operated out of a fifty mile radius from Stockbridge. The Savannah hospice operated in a fifty mile radius around Savannah and the Valdosta hospice operated in a fifty mile radius around Valdosta.(SMF ¶¶ 4-5; 6-8)
- Each hospice operated separately. [30]
- Each hospice maintained a separate State hospice license and separate Medicare license. (SMF ¶ 20-21)
- Each hospice employed a separate Administrator, a separate Director of Nursing, a separate clinical staff and a separate marketing staff.[31]
- Each hospice maintained a separate hospice license, a separate bank account, a separate employee group health insurance policy and a separate ADP payroll account. (SMF ¶ 24)

Coakley, however, argues that the each corporation should answer for the (legal) sins of the others because they are a "single employer or integrated enterprise." (Response Brief, p. 28-29). Coakley misunderstands the authority she

---

30 SMF ¶ 19. (Defendants agree that Northeast and Hillendale operated out of one license). In her response to SMF, ¶. 19, Coakley relies on a legal theory that the Defendants might be a single employer or integrated enterprise. Coakley make **no** attempt to factually dispute the statement.

31 SMF, ¶ 22. State regulations forbid an Administrator or Director of Nursing from being employed under more than one license. Id., ¶ 23.

cites—including the seminal case of *Lyes v. City of Riviera Beach.* [32] In *Lyes,* the district court dismissed a Title VII claim because the city agency "did not employee the minimum number of people" for the claim to be actionable.[33]  Sitting *en banc* in *Lyes*, the Eleventh Circuit in addressed the "test applicable for deciding whether the employees of two employers are to be aggregated ***for determining if the minimum number of employees exist for Title VII coverage***."[34]  Similarly, in *McKenzie v. Davenport-Harris Funeral Home*, [35] whether a claim could be brought turned on whether the two defendants employed fifteen or more persons. [36]  These cases have nothing to do with the question before this Court now: whether the SVP Defendants are proper parties to this suit. Plaintiff melodramatically calls Defendants' argument "sanctionable," but it is Coakley who failed to cite authority for the proposition that three distinct independent corporations that entered into management contracts with the same entity can thereby be held liable for the actions of two others distinct independent corporations.

Coakley also relies on *Bruce v. S&H Riggers and Erectors, Inc.* for the proposition that a parent company may be held the "employer" of the employees of its subsidiaries.[37] But again, those facts *have nothing to do with this case.* The SVP Defendants are not the parent companies of the Hillendale/Northeast hospice,

---

[32] 166 F.3d 1332 (11th Cir. 1999)

[33] *Id*, 166 at 1341. *Lyes* also addressed an issue related to 42 U.S.C. 1985(3) not applicable here.

[34] *Id*., 166 F.3d 1332, 1335 (emphasis added).

[35] 834 F.2d 930 (11th Circ. 1987)

[36] *Id*, at 932.

[37] 732 F. Supp. 1172 (N.D. Ga. 1990).

which actually employed Plaintiff. They are simply related hospice companies owned by different groups of people, serving different markets, but which all contracted with Metropolitan Hospice, Inc. and then Serenity Management Group, Inc. for billing, management support, human resources, and accounts payable services.[38] Were Metropolitan or SMG a party to this Action, Plaintiff *might* have an integrated enterprise argument to make with respect to those two entities. But such is not the case.

Beyond their legal claims, Coakley has not demonstrated the factual underpinning of a joint employer or integrated enterprise theory. "Regardless of the interrelationship of two or more companies, the key issue in determining whether multiple entities constitute a 'single employer' for the purpose of a Title VII claim is the 'degree of control an entity has over the adverse employment decision on which the Title VII suit is based.'"[39] "Where control over employment matters, particularly the employment decision at issue in the case, is lacking, courts find that the integrated-enterprise test cannot be satisfied, even if the evidence indicates some inter-relationship of the two entities."[40] Moreover, "the doctrine of limited liability creates a strong presumption that a parent company is not the employer of

---

[38] P. SOF at ¶¶ 31–32.

[39] *Parton v. UPS*, 2005 U.S. Dist. LEXIS 45985, *18-26, 2005 WL 5974445 (N.D. Ga. Aug. 3, 2005) (quoting *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1244-1245 (11th Cir. 1998)); *see also Walker v. Boys & Girls Club of Am.*, 38 F. Supp. 2d 1326, 1330 (M.D. Ala. 1999) ("The focal point of the court's inquiry is the degree of control an entity has over the adverse employment decision on which the Title VII claim is based.").

[40] *Id.* (citing *Llampallas*, 163 F.3d at 1245). Coakley has made no attempt to distinguish *Llampallas* and its requirement that a person receive payment to be an employee for purposes of Title VII.

its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances."[41]

Coakley's legal supposition leads to the absurd conclusion that a hypothetical convenience store separately operated and incorporated in California would be liable *along with every other* separately incorporated sister company across the country for the bad actions of a Georgia store because they have (in this hypothetical) the same parent company that has some overlapping ownership and policies. Defendants acknowledge that the integrated employer test might allow the Georgia convenience store to be sued under Title VII even if it has less than fifteen employees and might also allow the parent company to be named as a proper defendant. But Coakley has cited no authority that allows her to sue Defendants SVP—the equivalent of the California convenience store—for an event that those three defendants had absolutely nothing to do with.

## 3. CONCLUSION

In this case, there is no evidence of discriminatory intent and Defendants have proffered ample evidence articulating legitimate, non-discriminatory reasons for terminating Plaintiff's employment. Moreover, Plaintiff has made no more than "conclusory allegation" that the proffered reason is pretextual, and has offered not "specific supporting facts" with actual "probative value."[42] Finally, the evidence shows that Defendants SVP were at all times completely unrelated to Plaintiff's employment and could not possibly be "employers" under Title VII or the FMLA. For these reasons, Defendants respectfully request that this Court grant summary

---

[41] *Id.* (citing *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993)).

[42] *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210 (11th Cir. 2000).

judgment as to all Plaintiff's claims and enter an order dismissing this action in its entirety.

    Respectfully submitted,

                                   **DeLong, Caldwell, Bridgers, Fitzpatrick & Benjamin, LLC**

| | |
|---|---|
| 3100 Centennial Tower | */s/ Kevin D. Fitzpatrick, Jr.* |
| 101 Marietta Street | Kevin D. Fitzpatrick, Jr. |
| Atlanta, GA 30303 | Georgia Bar No. 262375 |
| (404) 979-3150 | |
| (404) 979-3170 (facsimile) | */s/ Charles R. Bridgers* |
| charlesbridgers@dcbflegal.com | Charles R. Bridgers |
| kevin.fitzpatrick@dcbflegal.com | Georgia Bar No. 080791 |
| | |
| | Counsel for Defendants |

Certificate of Compliance

The undersigned counsel certifies that the within and foregoing document was prepared using Times New Roman, 14 point, with a line spacing of exactly 28 points in compliance with the Local Rules of the U.S. District Court for the Northern District of Georgia.

*/s/ Charles R. Bridgers*
Charles R. Bridgers
Georgia Bar No. 080791

Certificate of Service

The foregoing document was filed via the ECF system which automatically provides service to all counsel of record:

Christopher Moorman
Nicholas Pieschel

This 22nd day of June 2015.

*/s/ Charles R. Bridgers*
Charles R. Bridgers
Georgia Bar No. 080791