IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| EBONE D. COAKLEY, | : | CIVIL ACTION NO. |
| | : | 1:13-CV-3537-MHC-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SERENITY PALLIATIVE AND | : | |
| HOSPICE CARE OF HILLENDALE, | : | **F I N A L   R E P O R T   A N D** |
| INC., *et al.*, | : | **RECOMMENDATION   ON   A** |
| | : | **M O T I O N   F O R   S U M M A R Y** |
| Defendants. | : | **JUDGMENT** |

Plaintiff Ebone Coakley brings this employment discrimination lawsuit, alleging that she was terminated because of her pregnancy, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. This action is now before the Court on Defendants' Motion for Summary Judgment [79]. For the reasons stated below, the undersigned **RECOMMENDS** that this Motion [79] be **GRANTED**.

## I.    FACTS

Unless otherwise indicated, the Court draws the following facts from Defendants' "Statement of Material Facts" [79-2] ("Def. SOMF"); Plaintiff's Response [86] ("Pl. Res. SOMF") thereto; Plaintiff's Statement of Material Facts [85] ("Pl. SOMF"); and Defendants' Response [90] ("Def. Res. SOMF").

Furthermore, the Court has not considered assertions of "fact" that are immaterial or are presented as legal conclusions, or that are unsupported by a citation to evidence in the record or asserted only in the party's brief and not the party's separate statement of facts. *See* LR 56.1B(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts.").

Viewing the evidence in the light most favorable to Plaintiff, as the nonmoving party, the Court finds as follows: Plaintiff was a full-time employee of Serenity Palliative and Hospice Care of Northeast Georgia, Inc. and Serenity Palliative and Hospice Care of Hillendale, Inc. (collectively referred to as "Northeast") from July 6, 2010 until May 27, 2011.[1] (Def. SOMF ¶ 55; Pl. SOMF ¶¶ 2-3). During 2010 and

---

[1] Defendants contend that Plaintiff's true employer is Northeast, and that as a result, the remaining Defendants (Serenity Palliative and Hospice Care of Savannah, Inc., Serenity Palliative and Hospice Care of Valdosta, Inc., and Providence Hospice, Inc.) have no possible liability to Plaintiff. MSJ [79-1] at 12. Because the undersigned recommends granting summary judgment to Defendants, the issue of which Defendant(s) should be held liable is of no consequence. Thus, the undersigned will not reach this issue.

However, because Defendant Northeast alone addresses the merits of Plaintiff's claims (whereas the other Defendants explain how they were not Plaintiff's employer and therefore cannot be held liable), the undersigned will refer to Defendant Northeast as a single Defendant when assessing Plaintiff's claims.

2011, Sandie Weathington was the administrator for Northeast and Plaintiff's supervisor. (Def. SOMF ¶¶ 66-67; Pl. SOMF ¶¶ 6-7). Plaintiff began her employment with Northeast as a social worker, and in August 2010, she was promoted to a community relations marketer. (Def. SOMF ¶¶ 52-53; Pl. SOMF ¶ 6). In this position, Plaintiff's primary responsibility was to secure qualifying patient referrals for Northeast. (Def. SOMF ¶ 68; Pl. SOMF ¶ 9). When she accepted this position, she understood that she was required to meet a monthly quota of qualified patient admissions—three in her first month, six in her second month, and nine for every subsequent month.[2] (Def. SOMF ¶¶ 73-74). As a marketer, Plaintiff earned a base salary of $50,000 per year and a $250 commission for each qualified admission over

---

[2] Plaintiff objects to this fact as being immaterial to Defendants' Motion for Summary Judgment. Pl. Res. SOMF [86] ¶ 73. This is a valid objection, but the Court overrules it. Plaintiff's performance quotas are not irrelevant to this Motion as explained in the discussion below.

The Court notes that Plaintiff has in most other instances failed to properly dispute Defendants' asserted facts with responses that comply with Local Rule 56.1. That rule requires a non-movant, here Plaintiff, to: (1) dispute any facts asserted by the movants with concise, individually numbered responses supported by specific citations to evidence; (2) state a valid objection to the admissibility of the movants' fact; or (3) point out that the movants' citation does not support their fact or that their fact is not material or has failed to comply with Local Rule 56.1B(1). *See* L.R. 56.1B(2). Plaintiff makes multiple blanket objections without specific support. Such objections are generally not considered.

her quota. (Def. SOMF ¶ 75; Pl. Res. SOMF ¶ 75). Ms. Weathington and Northeast's Director of Nursing were responsible for scheduling the Medical Director's visits with patients to determine whether they qualified for hospice care under Medicare and state regulations. (Def. SOMF ¶ 72[3]).

In her first month (September 2010), Plaintiff obtained seventeen patient referrals, thirteen of which qualified as hospice patients. (Def. SOMF ¶ 76). In her second month (October 2010), Plaintiff obtained sixteen patient referrals, eleven of which qualified as hospice patients. (Def. SOMF ¶ 77). During this month, Northeast increased Plaintiff's base salary to $65,000. (Def. SOMF ¶ 78). Plaintiff secured fifteen patient referrals in both November and December 2010, out of which ten qualified as hospice patients each month. (Def. SOMF ¶¶ 79-80). In her fifth month (January 2011), Plaintiff obtained thirteen referrals, seven of which qualified, in her sixth month (February 2011), she obtained six referrals, five of which qualified, in her seventh month (March 2011), she obtained ten referrals, three of which qualified, and in her eighth month (April 2011), she obtained six referrals, three of which qualified. (Def. SOMF ¶¶ 81-84).

---

[3]  Plaintiff objects to this fact as being immaterial to Defendants' Motion for Summary Judgment. Pl. Res. SOMF [86] ¶ 72. The undersigned overrules this objection.

4

In March 2011, Plaintiff informed Ms. Weathington that she was pregnant, and that she anticipated taking Family and Medical Leave Act leave later that year. (Def. SOMF ¶ 86; Pl. Res. SOMF ¶ 86). Ms. Weathington asked Plaintiff whether she would be a stay-at-home mother after having her baby. (Def. SOMF ¶ 87; Pl. SOMF ¶ 16). Ms. Weathington also suggested that Plaintiff not gain too much weight during her pregnancy. (Def. SOMF ¶ 88; Pl. SOMF ¶ 17). Plaintiff testified that Ms. Weathington's comments were harassing, and that Ms. Weathington's demeanor changed, and she no longer had "chummy conversations" with Plaintiff after learning about Plaintiff's pregnancy. (Def. SOMF ¶¶ 89-90; Pl. SOMF ¶¶ 18-19).

Northeast hired two new marketers in late April or early May 2011, after which Plaintiff had greater difficulty in meeting her quotas. (Def. SOMF ¶¶ 91-92; Pl. SOMF ¶¶ 24, 28; Pl. Res. SOMF ¶¶ 91-92). Plaintiff also believed that, after learning of her pregnancy, Ms. Weathington kept her referrals from becoming admissions. (Def. SOMF ¶ 93; Pl. Res. SOMF ¶ 93). On April 27, 2011, Plaintiff met with Ms. Weathington and Gil Messick, Northeast's Senior Vice President, to discuss her failure to meet her quota during January, February, March, and April 2011. (Def. SOMF ¶¶ 39, 94; Pl. SOMF ¶¶ 20-23; Pl. Res. SOMF ¶ 94). They made suggestions to help her meet her quota and implemented a Plan of Correction. (Def. SOMF ¶ 94;

Pl. SOMF ¶ 20; Pl. Res. SOMF ¶ 94). On April 29, 2011, Plaintiff obtained a medical release from work because she was partially incapacitated for ten days due to sciatica. (Def. SOMF ¶ 95; Pl. SOMF ¶¶ 26-27; Pl. Res. SOMF ¶ 95).

As of May 27, 2011, Plaintiff secured six referrals, only two of which qualified as hospice patients. (Def. SOMF ¶ 97). On that day, Plaintiff telephoned Ms. Weathington regarding a referral she was attempting to secure. (Def. SOMF ¶ 98; Pl. SOMF ¶ 29; Pl. Res. SOMF ¶ 98). Plaintiff thought Ms. Weathington was unwilling to secure the medical certification to determine whether the patient was a qualified hospice patient. (Def. SOMF ¶ 99; Pl. SOMF ¶ 30; Pl. Res. SOMF ¶ 99). Plaintiff believed that Ms. Weathington failed to approve her patients for hospice admission because of her pregnancy. (Def. SOMF ¶ 130; Pl. Res. SOMF ¶ 130). However, Plaintiff acknowledged that she had no evidence that Ms. Weathington had held up any patient referrals. (Def. SOMF ¶ 131; Pl. Res. SOMF ¶ 131). Plaintiff told Ms. Weathington that she wanted to contact the medical director herself, but Ms. Weathington told her not to do so. (Def. SOMF ¶ 100; Pl. SOMF ¶ 31; Pl. Res. SOMF ¶ 100). Plaintiff then insisted on contacting the medical director, at which point Ms. Weathington became upset. (Def. SOMF ¶ 100; Pl. SOMF ¶ 32; Pl. Res. SOMF ¶ 100). Ms. Weathington then instructed Plaintiff to report immediately to the office

to meet with her and Mr. Messick. (Def. SOMF ¶ 102; Pl. SOMF ¶ 32).[4] Plaintiff then met with the individual she was hoping to secure as a referral, attended an appointment with her counselor, and again sought to obtain the potential referral's signature on a medical release. (Def. SOMF ¶¶ 104-06; Pl. SOMF ¶ 34).

In 2010 and 2011, the hospice staff at Northeast participated in a daily conference call each afternoon at 3:45 p.m. (Def. SOMF ¶ 107; Pl. SOMF ¶ 35; Pl. Res. SOMF ¶ 107). During the call on May 27, 2011, Northeast's Director of Nursing, Connie Wills, asked Plaintiff if she was coming to the office to meet with Mr. Messick and Ms. Weathington. (Def. SOMF ¶ 109; Pl. Res. SOMF ¶ 109). Plaintiff responded: "I don't know, I haven't decided yet." (Def. SOMF ¶ 110; Pl. Res. SOMF ¶ 110). The conference call ended at 4:15 p.m. (Def. SOMF ¶ 112; Pl. SOMF ¶ 35; Pl. Res. SOMF ¶ 112). At 3:56 or 3:57 p.m., Ms. Weathington texted Plaintiff to inform her that the "refusal to come to the office is grounds for immediate

---

[4] Plaintiff disputes that Ms. Weathington used the word "immediately;" however, Plaintiff acknowledges that Ms. Weathington said: "Ebone, *now*, you come into this office, there's always some pushback with you." (Pl. SOMF ¶ 32; Pl. Res. SOMF ¶ 102) (emphasis added). Any difference between "now" and "immediately" is not sufficient to create a legitimate or material dispute of fact, and therefore, the Court overrules this objection. *See* OXFORD ENGLISH DICTIONARY (3d ed. 2003) (defining "now" as "[i]n the time directly following on the present moment; *immediately*, at once") (emphasis added).

termination." (Def. SOMF ¶ 114; Pl. SOMF ¶ 39; Pl. Res. SOMF ¶ 114). Plaintiff responded via a text message stating: "I'm on my way." (Def. SOMF ¶ 115; Pl. SOMF ¶ 38; Pl. Res. SOMF ¶ 115). Northeast's daily business hours concluded at 5:00 p.m. in 2010 and 2011; however, Mr. Messick and Ms. Weathington waited for Plaintiff until 5:15 p.m. (Def. SOMF ¶ 117; Pl. Res. SOMF ¶ 117). Plaintiff stated that she arrived at the office at 5:25 p.m., which was after Mr. Messick and Ms. Weathington had left. (Def. SOMF ¶ 119; Pl. SOMF ¶ 40; Pl. Res. SOMF ¶ 119). Mr. Messick authorized Ms. Weathington to terminate Plaintiff's employment because Plaintiff had been insubordinate to Ms. Weathington on the telephone and because Plaintiff had failed to report to the office before the close of business on May 27, 2011. (Def. SOMF ¶ 120; Pl. SOMF ¶ 52).[5]

At approximately 6:50 p.m., Plaintiff telephoned Ms. Weathington at her home. (Def. SOMF ¶ 121; Pl. Res. SOMF ¶ 121). During that conversation, Plaintiff informed Ms. Weathington that she had reported to the office, but that no one had been there. (Def. SOMF ¶ 122; Pl. SOMF ¶ 41; Pl. Res. SOMF ¶ 122). Ms.

---

[5] Although Plaintiff disputes that Mr. Messick authorized her termination, she has presented no record evidence that indicates that Ms. Weathington was actually the decisionmaker. Pl. Res. SOMF ¶ 120. Moreover, Plaintiff acknowledges that Ms. Weathington told her to contact Mr. Messick to discuss her termination. *Id.*

Weathington informed Plaintiff that she and Mr. Messick had waited until 5:15 p.m. for Plaintiff, that Plaintiff had four hours and fifteen minutes to report, and that she did not call to say that she would be late. (Def. SOMF ¶ 123). Ms. Weathington told Plaintiff that if she felt like Ms. Weathington had lied to her or been unfair, Plaintiff could speak with Mr. Messick on the following work day – Tuesday, May 30, 2011. (Def. SOMF ¶ 124; Pl. SOMF ¶ 41). On May 30, 2011 at approximately 9:30 a.m., Plaintiff telephoned Ms. Weathington at the office and asked if she had been fired on the previous Friday. (Def. SOMF ¶ 125). Ms. Weathington responded that she thought Plaintiff had wanted to speak with Mr. Messick, but Plaintiff stated that she did not wish to do so. (Def. SOMF ¶ 125). Ms. Weathington then informed Plaintiff that her employment had been terminated effective May 27, 2011, for insubordination during their telephone conversation and for failure to follow instructions to report to the office immediately. (Def. SOMF ¶ 128; Pl. SOMF ¶¶ 44-45; Pl. Res. SOMF ¶ 128).

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as

to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

10

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249. Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *See id.* at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *See id.*; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *See Anderson*, 477 U.S. at 248. An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249-50. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Moreover, for factual issues to be genuine, they must have a real basis in the record. *See Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

B. <u>Pregnancy Discrimination Claim</u> (Count I)

Plaintiff alleges that Defendant terminated her employment based on her pregnancy status, in violation of the Pregnancy Discrimination Act ("PDA"), 92 Stat. 2076, which amended Title VII. Compl. [1] ¶¶ 34-37.

1. *Standard of Proof under Title VII*

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The PDA amended Title VII so that "because of sex" would also include discrimination "because of or on the basis of pregnancy" and against "women affected by pregnancy." 42 U.S.C. § 2000e(k). The analysis for a pregnancy discrimination claim is the same as for a Title VII sex discrimination

12

claim. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312-13 (11th Cir. 1994). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence. *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). Additionally, statistical proof may also be used as circumstantial evidence to establish intent. *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." BLACK'S LAW DICTIONARY 675 (10th ed. 2014); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs*

13

*Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998). Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence.

Instead, evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley*, 907 F.2d at 1081-82. Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, such as by using the framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield*, 115 F.3d at 1561-62; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Combs*, 106 F.3d at 1527.

Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Holifield*, 115 F.3d at 1562; *see Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a prima facie case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs*, 106 F.3d at 1529. A prima facie case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529.

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *U. S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix*, 738 F.2d at 1184. The "ultimate question" is not whether a plaintiff has established a prima facie case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.* at 1184 (quoting *Aikens*, 460 U.S. at 713-14). The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

Nevertheless, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff also may defeat a summary judgment motion by presenting "a convincing mosaic of

circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (quotation marks omitted).

2. *Plaintiff's Prima Facie Case*

Plaintiff does not contend that she has produced any direct evidence of discriminatory intent; thus her Title VII claim of discrimination based on pregnancy rests purely on circumstantial evidence and will first be analyzed under the *McDonnell Douglas-Burdine* framework. Under this framework, a plaintiff can generally establish a prima facie case of unlawful discrimination under Title VII by showing that: (1) she is a member of a protected class;[6] (2) she was subjected to an adverse employment action by her employer; (3) she was qualified to do the job in question; and (4) her employer treated similarly situated employees outside her protected classification (*i.e.*, those who were not pregnant) more favorably than it

---

[6] Although courts continue to include the requirement that a plaintiff establish as part of a prima facie case that he or she is a member of a "protected class," it is clear that individuals of either sex may pursue claims of employment discrimination under Title VII. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1290 n.3 (11th Cir. 1999) (citing *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir. 1971)). Thus, the key element of the prima facie case is establishing that persons outside of the plaintiff's protected classification (*i.e.*, those of a different sex) were treated more favorably by the employer. *See Wright*, 187 F.3d at 1290 n.3. Moreover, the PDA clearly lists pregnancy as a protected class. *See* 42 U.S.C. § 2000e(k).

treated her. *See McDonnell Douglas*, 411 U.S. at 802; *see also Wright*, 187 F.3d at 1290; *Holifield*, 115 F.3d at 1562.

It is undisputed that Plaintiff is a member of a protected class as a pregnant female, and that she was qualified for her job with Defendant. Moreover, it is undisputed that Plaintiff was subjected to an adverse employment action as Defendant terminated her employment. The only remaining question is whether Defendant treated similarly situated employees outside her protected classification (i.e., those not pregnant) more favorably than it treated her.[3]

a. Comparator Evidence

Plaintiff argues that Defendant treated Chris Ferguson and Crystal Scott— employees she deems to be similarly situated—more favorably than it treated her. Pl. Res. [83] at 12-15. Specifically, Plaintiff argues that Ms. Weathington had written up Ms. Ferguson—who was also a marketer at the Northeast office—on September 6 (for being unavailable by phone and for not wearing a lab coat and name tag in

---

[3] Plaintiff argues that Defendant acknowledged that she had set forth a prima facie case. *See* Res. [83] at 6. The undersigned disagrees. Instead, Defendant first stated that "no evidence of discriminatory intent" exists. MSJ [79-1] at 3. Defendant then provided its legitimate, non-discriminatory reasons for terminating Plaintiff's employment after assuming arguendo that Plaintiff had set forth a prima facie case. *Id.* at 8. Nowhere in its brief does Defendant concede that Plaintiff has in fact established a prima facie case. *See generally id.*

18

facilities), October 28, 2011 (for failure to make a timely payment to a nursing home), on March 21, 2012 (for "Failure to follow admission process / protocol"), on May 17, 2012 (for "Failure to report to office as instructed by administrator"), and on May 24, 2012 (for missing daily sheets and profiles). *Id.* at 13; 78-37–78-40. Plaintiff notes that a Plan of Correction for the May 17 incident listed Ms. Ferguson's behavior as insubordination. Pl. Res. [83] at 13.

Plaintiff notes that Ms. Scott was a social worker, which was Plaintiff's initial position, at the Northeast location, and that Ms. Weathington issued a verbal warning to Ms. Scott on February 29, 2012 for "insubordination to administrator" relating to "inappropriate" comments during a conference call, being "argumentative," and refusing to "come to the office immediately." *Id.* at 14-15. Nevertheless, neither Ms. Ferguson's nor Ms. Scott's employment were terminated. *Id.* at 15.

"When evaluating an allegation of disparate treatment," courts "require that a comparator be similarly-situated to the plaintiff in all relevant respects." *Stone & Webster Constr. v. U.S. Dept. of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (quotations and citation omitted). The comparator "must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the

employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (quotation omitted).[4]

"Even if a plaintiff and comparator are similar in some respects, differences in their overall record may render them not 'similarly situated' for purposes of establishing a prima facie case." *Brown v. Jacobs Eng'g, Inc.*, 572 F. App'x 750, 752 (11th Cir. 2014). For example, in *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316-1317 (11th Cir. 2003), the Eleventh Circuit affirmed a grant of summary judgment despite evidence that the African-American plaintiff was disciplined more harshly than a Caucasian co-worker who performed the same job, and who committed similar infractions. The court found that the plaintiff failed to establish that the two employees were similarly situated in all relevant respects because, despite similarity in their misconduct, the comparator's overall record was better. *See id.* "The quantity and quality of the comparator's misconduct must be nearly identical." *Brown*, 401 F.

---

[4] Plaintiff notes that this Circuit's "nearly identical" conduct requirement was called into question by a later panel decision that noted that a potential comparator's conduct merely needed to be similar. Pl. Res. [83] at 12 n.5. This Court, however, is bound by the "nearly identical" conduct requirement because "when a later panel decision contradicts an earlier one, the earlier panel decision controls." *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citing *Walker v. Mortham*, 158 F.3d 1177, 1188-89 (11th Cir. 1998). Nevertheless, this issue is immaterial because, as explained below, Plaintiff's comparator evidence is insufficient to create a triable issue of fact under either formulation of the standard.

App'x at 480 (quotations and citation omitted). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (quotations and citation omitted).

Thus, courts typically examine proffered comparators in detail to ensure that any comparison is not "confusing apples with oranges." *Burke-Fowler*, 447 F.3d at 1323; *see also McCallister v. Hillsborough Cnty. Sheriff*, 211 F. App'x 883, 885-86 (11th Cir. 2006) (finding that individuals whom Plaintiff identified were not similarly situated because Plaintiff broke six rules while individuals in question broke between one and three rules); *Greer v. Birmingham Beverage Co., Inc.*, 291 F. App'x 943, 946 (11th Cir. 2008) (finding that Plaintiff failed to identify similarly situated individuals; coworkers Plaintiff identified were disciplined once for excessive cell phone usage, while Plaintiff was disciplined twice); *Roy v. Broward Sheriff's Office*, 160 F. App'x 873, 876 (11th Cir. 2005) (finding that plaintiff, a terminated deputy sheriff, did not identify any similarly situated individuals; closest potential comparator was not in uniform and riding in a private vehicle at time of incident in question, while plaintiff was in uniform and driving a police car at time of incident leading to termination). Courts consider whether the proffered comparator had the same supervisor, *see*

21

*Morris v. Potter*, 251 F. App'x 667, 668-69 (11th Cir. 2007), as well as the type of position the plaintiff holds and the content of the plaintiff's work. *See Simionescu v. Bd. of Tr. of the Univ. of Ala.*, 482 F. App'x 428, 430-31 (11th Cir. 2012) (finding that two university faculty members were not similarly situated because one was not tenure-track, while plaintiff was, and second faculty member taught in a different department than did plaintiff). Finally, courts also consider whether the plaintiff and the proffered comparator were employed for similar periods. *See Roy*, 160 F. App'x at 876 (finding that proffered comparator was not similarly situated because comparator had been with department for sixteen years, while plaintiff had less than 18 months of service).

Applying these standards, Ms. Ferguson and Ms. Scott are not appropriate comparators. Most basically, Plaintiff does not cite any evidence establishing that these women were non-pregnant at the time of the relevant discriminatory action. To the contrary, she states only that Ms. Ferguson had "no suggestion of pregnancy," and that Ms. Scott was "not suggested to be pregnant." *Id.* at 12, 14. It is entirely unclear what this even means, much less how it explains the basis for Plaintiff's apparent belief that these women were not pregnant. Perhaps by way of explanation, Plaintiff filed an affidavit stating that she and Ms. Ferguson had discussed Plaintiff's

pregnancy, and that to Plaintiff's knowledge, Ms. Ferguson "was not pregnant at any time when we worked together." Pl. Dec. [87] ¶ 13. This fails on multiple levels. What Ms. Ferguson did or did not tell Plaintiff about her own medical condition is rank hearsay. And, in any event, that Ms. Ferguson might not have volunteered that she was pregnant is not proof of anything. Moreover, Plaintiff's employment was terminated in May 2011, whereas Ms. Ferguson was disciplined but not fired for allegedly similar conduct one year later. Plaintiff has not provided any information about whether Ms. Ferguson was pregnant at this time. Plaintiff provides no information at all regarding whether Ms. Scott was pregnant or not.

In any event, even assuming that both Ms. Ferguson and Ms. Scott were not pregnant, Plaintiff still fails to show that they are proper comparators. First, Plaintiff has provided no information about who made the decisions to discipline or not discipline Ms. Ferguson and Ms. Scott. Specifically, nothing in the record suggests that Mr. Messick was involved with the disciplinary decisions of Ms. Ferguson and Ms. Scott. *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (noting that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis").

23

Second, Plaintiff has not established that the misconduct of Ms. Ferguson and Ms. Scott was materially similar to her own. *See Wilson*, 376 F.3d at 1091. Plaintiff's evidence reveals that Ms. Scott was written up for insubordination to an administrator, told to report to the office immediately, and warned that further insubordination would result in immediate termination. However, there is no evidence of what happened from there, *i.e.*, whether Ms. Scott actually reported as instructed or, like Plaintiff, did not. Plaintiff was ultimately fired for not going to the office after being told to do so in response to her disrespectful conversation with Ms. Weathington, her supervisor. The facts do not show that this happened with Ms. Scott.

As for Ms. Ferguson, the evidence to which Plaintiff points shows that Ms. Ferguson was written up for various deficiencies including failing to report to the office as instructed, which Plaintiff states was described as "insubordination." Pl. Res. [83] at 13. But there is no evidence that Ms. Ferguson failed to report to the office on the heels of a confrontational and disrespectful altercation with her supervisor. There is a difference between a mere failure to report and a failure to report on the same day as having openly fought and been oppositional with your boss. There is no evidence that Ms. Ferguson was considered to be guilty of the latter.

24

For these reasons, Plaintiff's showing of disparate treatment here is insufficient. In making this determination, the Court does not consider the declaration of Ms. Weathington that Defendant submits in reply to its Motion for Summary Judgment. *See generally* Objection [92]. Plaintiff argues that this second declaration contains new evidence that was untimely filed, and thus, this Court should not consider it. *Id.* at 3.

Ms. Weathington's second declaration [90-1] contains additional information about the circumstances surrounding Ms. Ferguson's and Ms. Scott's alleged misconduct. Defendant argues that it needed to submit this additional affidavit to ensure that the Court has a complete record. *See* Res. [94] at 3. Defendant argues that this affidavit was necessary because Plaintiff first raised the claim in her Statement of Material Facts that Defendant had treated her differently than it had treated Ms. Ferguson and Ms. Scott. *Id.* at 1-2. Defendant points out that Plaintiff had previously not identified any alleged comparators, and that she failed to list Ms. Scott and Ms. Ferguson as potential witnesses. *Id.* at 2. Defendant argues that Ms. Weathington's second declaration should not be stricken, but that Plaintiff should seek permission to file a surreply or supplemental affidavits. *Id.* at 3-4.

25

The undersigned notes that Defendant failed to seek leave to file this evidence, which violates this Court's Local Rules. *See* LR 56.1A, NDGa ("the parties shall not be permitted to file supplemental briefs and materials, with the exception of a reply by the movant, except upon order of the court"). The Court also points to deposition testimony in which Plaintiff inquired about these alleged comparators. *See* Ash Depo. [78-1] at 131-54, 162, 165-68. Therefore, the Court does not consider the affidavit. Nevertheless, the permissibility of this additional declaration is inconsequential because, even without considering this declaration, Plaintiff's comparator evidence does not create a triable issue of fact, and Plaintiff is unable to show that these other employees are probative comparators.

b.  Defendant's Legitimate, Nondiscriminatory Reason

In any event, even had Plaintiff set forth a prima facie case of pregnancy discrimination, Defendant has provided a legitimate, nondiscriminatory reason to explain Plaintiff's termination: Plaintiff's insubordination. MSJ [79-1] at 10. Specifically, Defendant references Plaintiff's failure to report to the office immediately on May 27, 2011 after Ms. Weathington instructed her via telephone to do so. *Id.* Earlier in that telephone conversation, Ms. Weathington and Plaintiff had discussed a patient referral that Plaintiff had attempted to secure. *Id.* at 8. According

26

to Defendant, Plaintiff "became argumentative and disrespectful" and called Ms. Weathington "a liar." *Id.* At this point, Ms. Weathington instructed Plaintiff to report to the office immediately to meet with her and Mr. Messick. *Id.* at 8-9.

Later that day, during a 3:45 p.m. conference call, Northeast's Director of Nursing, Connie Wells, asked Plaintiff is she was going to report to the office to meet with Ms. Weathington and Mr. Messick. *Id.* at 9. Plaintiff responded: "I don't know, I haven't decided yet." *Id.* At 3:56 p.m., Ms. Weathington texted Plaintiff to inform her that the refusal to report to the office as instructed was "grounds for immediate termination." Nevertheless, Plaintiff did not report to the office by 5:00 p.m., which was the close of business. *Id.* Ms. Weathington and Mr. Messick waited an additional fifteen minutes, but Plaintiff did not arrive, nor did she contact them in any way to inform them that she was running late. *Id.* at 9-10. Defendant terminated Plaintiff's employment based upon this failure to report, which Defendant deemed to be insubordination. *Id.* at 10. As Defendant has presented a legitimate, non-discriminatory reason for terminating Plaintiff's employment, the burden shifts back to Plaintiff to show that Defendant's stated reason of insubordination is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman*, 698 F.2d at 1142.

27

c. Pretext

Plaintiff argues that Defendant's proffered legitimate, non-discriminatory reason of insubordination is actually pretextual. Pl. Res. [83] at 7.

(1)    Identity of the Decisionmaker

Plaintiff contends that an alleged ambiguity as to who made the decision to terminate her employment calls into question Defendant's proffered reason. Pl. Res. [83] at 8-11. She notes that Defendant claims that Mr. Messick made the decision, but argues that Ms. Weathington actually made this decision. *Id.* at 10. Plaintiff argues that this discrepancy is material because Ms. Weathington had made comments to her about not gaining too much weight during her pregnancy, and because Ms. Weathington had written up but not terminated other non-pregnant employees for insubordination.[5] Plaintiff bases this argument regarding the decisionmaker on "documents submitted to the DOL by Defendants [that] reveal that the termination was decided and carried out by Weathington." *Id.* However, Plaintiff cites to no record evidence in support of this contention. Moreover, Plaintiff herself acknowledges and cites to deposition testimony that Defendant's 30(b)(6)

---

[5] To the extent that Plaintiff is referring to Ms. Ferguson and Ms. Scott, these individuals are not proper comparators as previously noted.

28

representative testified that Mr. Messick had made the decision to terminate her employment. *Id.* at 8-9. Thus, the undersigned does not find that any ambiguity exists regarding the identity of the decisionmaker. Even if such an ambiguity existed, it would be insufficient to call into question Defendant's proffered reason of insubordination.

Notably, aside from disputing this characterization of her behavior, Plaintiff does not dispute Defendant's statements that she said on the conference call that she was not sure if she would report to the office as Ms. Weathington instructed on May 27, 2011, that she did not arrive at the office before Mr. Messick and Ms. Weathington left on that day, and that she did not contact them to let them know that she would be late. *See generally* Pl. Res. [83].

(2)     Shifting and Inconsistent Explanations

Plaintiff argues that Defendant's 30(b)(6) witness testified that her employment was terminated for insubordination, but that the Department of Labor Separation Notice that Ms. Weathington filled out provided the following reasons: insubordination, failure to perform job duties as described in her offer letter and job description, failure to complete account profiles per process and policy, and failure to complete marketing report per policy and training. Pl. Res. [83] at 16-17. Thus,

29

Plaintiff claims that Defendant has presented "shifting reasons" for terminating her employment. *Id.* at 19.

This is not a case where shifting reasons create an issue of fact. From the beginning, Defendant has stated that a principal reason for terminating Plaintiff's employment was her insubordination. Plaintiff acknowledges this fact but points out that the Separation Notice provided to the Department of Labor lists other secondary reasons as well, including performance based reasons.  However, these additional reasons are not necessarily inconsistent. The Eleventh Circuit has made clear that "the existence of a possible additional non-discriminatory basis for [a plaintiff's] termination does not, however, prove pretext." *Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th Cir. 1998); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996) ("the reasons given by Schindler are not incompatible, and therefore not properly described as 'shifting reasons.'"). That the record includes some references to additional reasons relating to Plaintiff's performance shortcomings does not show that the reference to insubordination was pretext.

In fact, the evidence supports the notion that Plaintiff was suffering performance problems. Specifically, Defendant has provided evidence regarding Plaintiff's failure to meet her admissions quota for at least four months, *see* Plan of

Correction [78-30]—which was a job duty set forth in her offer letter [*See* 78-24]—and Plaintiff has not disputed this contention. This failure led to Defendant's placing Plaintiff on a corrective action plan on April 27, 2011 [Doc. 77-9; 78-30], which she was still on when she had the altercation with Ms. Weathington on May 27, 2011. That there was a perceived performance deficiency as part of this history is consistent with Defendant's explanation.

Another issue mentioned on the Department of Labor's Separation Notice was "failure to complete account profiles per process and policy." Pl. Res. [83] at 17. Plaintiff points to Mr. Ash's testimony that this is not itself a ground for termination. However, the Separation Notice did not purport to state that this reason was in itself a ground for termination; rather it was a combination of several issues generally described as "insubordination and failure to perform job duties." *See* Separation Notice [78-31]. On these facts, there are no "shifting reasons" sufficient to show pretext.

(3)    Temporal Proximity

Plaintiff argues that the temporal proximity between her notifying Ms. Weathington of her pregnancy and the date of her termination supports pretext. Pl.

31

Res. [83] at 21. Plaintiff notes that she informed Ms. Weathington that she was pregnant in March 2011, and that her employment was terminated on May 27, 2011.

Timing is relevant to the determination of whether a prima facie case exists. *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1268 (11th Cir. 2008). However, the mere timing alone is generally insufficient to establish pretext. *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) (affirming summary judgment for employer who provided "ample legitimate reasons" for terminating plaintiff's employment, and where plaintiff's only evidence of pretext was temporal proximity and her employer's alleged statement from which a weak inference could be drawn that her employment was terminated because of her son's illness). Here, more than two months elapsed between Ms. Weathington's learning that Plaintiff was pregnant and Plaintiff's termination. (Def. SOMF ¶¶ 86, 128; Pl. SOMF ¶¶ 3, 13, 44). This timing is borderline sufficient at best for establishing a prima facie case. *See Higdon v. Jackson*, 393 F.3d 1211, 1220-21 (11th Cir. 2004) (finding that three-month period between protected activity and adverse employment action, in the absence of other evidence of causation, was insufficient to establishing a prima facie case of Title VII retaliation); *Robinson v. LaFarge N. Am., Inc.*, 240 F. App'x 824, 829 (11th Cir. 2007) (per curiam) (citing *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th

32

Cir. 2000)) (finding that causation was sufficiently alleged where adverse action occurred about two months after protected activity). Such temporal proximity is clearly insufficient to establish pretext. *See Wascura*, 257 F.3d at 1247.

(4)   Ms. Weathington's comments

Plaintiff argues that Ms. Weathington's comments to her after learning about her pregnancy provide additional evidence of pretext. Pl. Res. [83] at 20. Plaintiff notes that Ms. Weathington: (a) asked whether she was going to be a stay-at-home mother; and (b) advised her not to gain too much weight. *Id.* Plaintiff contends that Ms. Weathington is "a really appearance focused person," and "it really mattered to her what you look like," so Plaintiff was worried about disclosing her pregnancy. *Id.* Plaintiff alleges that after learning about her pregnancy, Ms. Weathington's demeanor toward her changed and she no longer had "chummy conversations" with her. *Id.* at 20-21. Plaintiff also claims that Ms. Weathington no longer assisted her as she had done before learning that Plaintiff was pregnant. *Id.* at 21. Plaintiff concedes that these comments are likely not direct evidence of discrimination, but she argues that they are relevant to a finding that Defendant's proffered reasons for terminating her employment are pretextual. *Id.*

33

To the extent Ms. Weathington's comments are probative as to discriminatory intent, they are minimally so. First, as previously noted, Defendant has established that Ms. Weathington was not the ultimate decisionmaker. Instead, Mr. Messick made the decision to terminate Plaintiff's employment after Plaintiff failed to appear for a meeting with Mr. Messick and Ms. Weathington. (Def. SOMF ¶ 120; Pl. SOMF ¶ 52). No evidence in the record even suggests that he knew that Plaintiff was pregnant. Thus, Ms. Weathington's alleged bias is not principally at issue. *See Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (noting that statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process at issue will not satisfy the employee's burden to establish that an employer's legitimate, nondiscriminatory reasons for its adverse action are pretextual) (quotation omitted).

Plaintiff disputes that Mr. Messick was the decisionmaker, arguing that she never had any dealings with him, and that it was Ms. Weathington that told her she was fired. Pl. Res. [83] at 10. However, Defendant has provided evidence that Mr. Messick was the person who authorized Ms. Weathington to terminate Plaintiff's employment. (Def. SOMF ¶ 120; Pl. SOMF ¶ 52). Thus, Defendant's explanation is consistent with Ms. Weathington's informing Plaintiff that she was terminated

34

without actually having the authority to make that decision. That Plaintiff did not personally deal with Mr. Messick on day-to-day matters does not in itself refute that he was the one with authority to terminate her. Ultimately, Plaintiff has not cited anything to refute Mr. Messick's testimony that he made the decision to terminate her employment and directed Ms. Weathington to take this action.

Second, assuming arguendo that Ms. Weathington participated in the decision to terminate Plaintiff's employment, Ms. Weathington's isolated comments are not sufficient to show pretext. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("[S]tray remarks in the workplace, ... statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not constitute direct evidence of discrimination.") (*superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074); *see also EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir.1990) (citing O'Connor's concurrence favorably); *Rojas v. Fla.*, 285 F.3d 1339, 1341-43 (11th Cir. 2002) (concluding that isolated comment, unrelated to decision to terminate plaintiff, was insufficient to show pretext). First, the comments were not addressed to the termination of Plaintiff's employment, which is the employment decision at issue. Second, Ms. Weathington's comments were not

necessarily disparaging. The first comment about staying at home could have been simply asking a question about future plans, and the second question about limiting the amount of weight gained could have merely been health advice. While these comments could plausibly have been intended as disparaging, the actual words used are at best only equivocal in that regard. Third, Plaintiff focuses on two isolated comments made at unstated times, perhaps as much as two months before Plaintiff's termination. Plaintiff's perception that Ms. Weathington was not as "chummy" or helpful is insufficiently specific to be of significant probative value on the question of Ms. Weathington's intent vis-à-vis Plaintiff's termination. Thus, these limited stray remarks do not satisfy Plaintiff's burden to show significant evidence of pretext.

C. <u>Family and Medical Leave Act ("FMLA") Claims</u> (Counts II and III)

Plaintiff raises two FMLA claims. First, she raises a claim of FMLA interference (Count II), arguing that Defendant terminated her employment because of her impending maternity leave. Compl. [1] ¶ 39. Second, she raises a claim of FMLA retaliation (Count III), alleging that Defendant terminated her employment in retaliation for her invoking her FMLA rights. *Id.* ¶ 44.

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided

36

under this subchapter." 29 U.S.C. § 2615(a)(1). An employee alleging that her employer violated her rights under the FMLA may assert two types of claims: interference claims, in which the employee asserts that her employer refused to provide her with rights granted under the FMLA, and retaliation claims, in which the employee alleges that her employer retaliated against her for exercising her rights under the FMLA, or for opposing any activity made unlawful under the FMLA. *See Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001); *see also Drago v. Jenne*, 453 F.3d 1301, 1305-08 (11th Cir. 2006); *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000).

To establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland*, 239 F.3d at 1207; *see also Martin*, 543 F.3d at 1266-67 ("To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA."). "[T]he right to commence FMLA leave is not absolute, and . . . an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010).

Here, Plaintiff was not denied FMLA leave. Rather, she was fired. For an employer to be held liable for FMLA interference in these circumstances, the employer's intention to avoid granting an otherwise meritorious request for leave must have been the proximate cause of the termination. *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1242 (11th Cir. 2010).

Similarly, "[t]o prove FMLA retaliation, an employee must show that his employer *intentionally* discriminated against him for exercising an FMLA right." *Martin*, 543 F.3d at 1267 (emphasis in original) (citing 29 U.S.C. § 2515(a)(2) and 29 C.F.R. § 825.220(c)). "Unlike an interference claim, an employee 'bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus.'" *Id.* at 1267-68 (quoting *Strickland*, 239 F.3d at 1207).

"Absent direct evidence of retaliatory intent," Courts apply the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792. *Id.* at 1268 (citing *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000)). "Under that approach, an employee claiming FMLA retaliation must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally related to the protected

38

activity." *Id.* To establish the necessary causal connection, an employee "need only show that the protected activity and the adverse action were not wholly unrelated." *Brungart*, 231 F.3d at 799 (quotations and citations omitted).

Once an employee states a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Martin*, 543 F.3d at 1268. After the employer makes this showing, the burden shifts back to the employee to show that the employer's stated, non-retaliatory reason was merely a pretext. *See id.* at 1244.

Here, it is undisputed that Defendant's termination of Plaintiff had the effect of denying Plaintiff her FMLA leave because, by definition, Plaintiff was no longer employed by Defendant at all. However, as noted above, Defendant has provided legitimate reasons for which it terminated Plaintiff's employment, and Plaintiff has failed to show that these reasons are pretextual. As a result, Plaintiff cannot meet her burden of showing that Defendant terminated her to interfere with her FMLA rights or in retaliation for her anticipated need to take FMLA leave. *See Schaaf*, 602 F.3d at 1242; *Martin*, 543 F.3d at 1268. Thus, Plaintiff's FMLA interference and retaliation claims also fail.

39

## III.   CONCLUSION AND RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [79] be **GRANTED**. The Clerk is **DIRECTED** to withdraw the reference to the undersigned.

**IT IS SO RECOMMENDED** this 28th day of December, 2015.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE